# EXHIBIT 1

|  |  |
|---|---|
| ANNA BEAVON GRAVELY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | **COMPLAINT** |
| v. ) | **Jury Trial Demanded** |
| ) | |
| AMERICANS FOR PROSPERITY, ) | |
| ) | |
| Defendant. ) | |

**NOW COMES** the Plaintiff, Anna Beavon Gravely, and alleges as follows:

## PARTIES

1. Plaintiff Anna Beavon Gravely is, and was at all times relevant to this Complaint, a resident of Raleigh, North Carolina, in Wake County.

2. Defendant Americans for Prosperity ("AFP") is a non-profit political advocacy group headquartered in Washington, D.C., with a registered office for its North Carolina branch (AFP-NC) in Raleigh, North Carolina, in Wake County. At all times relevant to this Complaint, AFP did business in the State of North Carolina and was the employer of Plaintiff under the common law of North Carolina and pursuant to the definition of that term under 29 U.S.C. § 2611(4) and 42 U.S.C. § 2000e(b).

3. AFP employed Plaintiff at all times relevant to this complaint.

## JURISDICTION AND VENUE

4. This Court has personal and subject matter jurisdiction over AFP because AFP operates within Wake County, North Carolina, and because the acts and omissions at issue have occurred in

Wake County, North Carolina.

5. Venue is proper because AFP operates within Wake County, North Carolina, and because the acts and omissions at issue have occurred in Wake County, North Carolina.

## GENERAL ALLEGATIONS

6. Ms. Gravely was first employed by AFP beginning on or about February 15, 2012 until January 4, 2014 as a Field Director.

7. From on or about October 26, 2015 until on or about December 6, 2016, Ms. Gravely worked as the State Director at Generation Opportunity ("GO"), a political advocacy group.

8. On or about December 6, 2016, GO merged with AFP.

9. Ms. Gravely was then employed by AFP as the Deputy State Director of AFP-NC beginning on or about December 16, 2016, and worked for Defendant until her termination on or about July 26, 2018.

10. Ms. Gravely maintained an exemplary record of work performance throughout the nearly five years she spent as an employee of AFP and related organizations.

11. During her time as Deputy State Director of AFP-NC, Ms. Gravely was assigned significant responsibility and discretionary authority, including managing AFP-NC business coalitions, internal and external communications for the branch, direct lobbying, and speaking on the record on behalf of AFP-NC.

12. From December of 2016 until January of 2018, Ms. Gravely was under the direct supervision of Donald Bryson, the State Director for AFP-NC.

13. Ms. Gravely was compensated in a manner consistent with a high-performing employee during this time, including a salary increase in August of 2017 and an incentive bonus in December of 2017.

14. Senior leadership in AFP increased Ms. Gravely's incentive bonus because she was a high-performing Deputy State Director and among the top 5% of deputy directors in the organization.

15. Ms. Gravely was repeatedly told by Mr. Bryson and others, including AFP Senior Vice President Teresa Oelke, that she was the best candidate for the role of the AFP-NC State Director when that position came open.

16. In January of 2018, Mr. Bryson resigned as the State Director for AFP-NC.

17. Phillip Joffrion, a Regional Director for AFP over an area that included AFP-NC, was the authorized hiring manager tasked with filling the vacant AFP-NC State Director position and would have the final discretion over which candidate was chosen to fill the role.

18. While Ms. Gravely had established a positive working relationship with Bryson, Mr. Joffrion had repeatedly displayed a critical attitude towards her, which appeared predicated on sexual stereotypes.

19. Ms. Gravely was made aware of the existence of prior complaints sounding in gender discrimination and/or sexual harassment made against Mr. Joffrion during his employment with AFP.

20. In early 2017, during a professional dinner with Ms. Gravely and Mr. Bryson, Mr. Joffrion ridiculed Ms. Gravely for having a "rigid" personality and critiqued her for being too "process-focused."

21. Mr. Bryson was confused by Mr. Joffrion's feedback regarding Ms. Gravely because he did not believe her to be rigid and did not understand what Mr. Joffrion meant by that. He also did not believe that being process-focused was a bad thing.

22. Mr. Bryson repeatedly communicated his opinion of Ms. Gravely's strong job performance

3

to Mr. Joffrion during the time that she was under his supervision, and considered her to be an exceptional employee and one of the hardest-working employees he had ever worked with in his professional career.

23. In assessing her job performance, Mr. Bryson believed that she consistently demonstrated respect for leadership, work partners, and teammates while being an effective communicator and collaborator to those with whom AFP-NC interacted.

24. On or about January 16, 2018, Ms. Gravely transitioned into the role of Acting State Director.

25. In late January, 2018, Ms. Gravely met with Mr.. Joffrion to discuss how the chapter would operate and how leadership responsibilities would be divided up.

26. At this January meeting, Mr. Joffrion told Ms. Gravely to "watch her back" because other people within the chapter were also applying for the State Director position and told her that everything she was doing would be scrutinized.

27. Ms. Gravely continued to receive positive feedback on her job performance and also made a positive impression during repeated rounds of interviews for the State Director position.

28. During the hiring interviews in late February or early March of 2018, Chase Downham, the Senior Vice President of State Operations, told Ms. Gravely that he had heard good things about her performance and stated something to the effect of "From what I've heard, you haven't missed a beat in North Carolina, which speaks to your leadership."

29. On March 13, 2018, Ms. Gravely was told that she was not selected for the State Director position, but that Chris McCoy, a Senior Field Director, had been chosen instead.

30. The role of Senior Field Director is three echelons below the position of State Director within AFP's organizational structure and carries significantly less responsibility.

31. Mr. McCoy had significantly less experience and was less prepared than Ms. Gravely for the

4

role.

32. Ms. Gravely was shocked that Mr. McCoy had been chosen because in early February 2018, she had discussed Mr. McCoy's work performance issues with Mr. Joffrion, particularly how his skills could be better utilized at AFP.

33. During that conversation, Mr. Joffrion told Ms. Gravely that Mr. McCoy should not be given any additional responsibilities until his volunteer and policy partner numbers were more consistent.

34. Mr. Bryson was also surprised at the hiring of Mr. McCoy as the State Director over Ms. Gravely and considered it to be an "extraordinary promotion" within the organization, even more so because Mr. McCoy had been in that role for less than a year.

35. Upon information and belief, no other Senior Field Director at AFP has been directly promoted to a State Director position.

36. Mr. McCoy communicated to Mr. Bryson that he had not intended to apply for the State Director job but Mr. Joffrion had been persistent in asking him to apply until he eventually did.

37. Mr. Bryson was also concerned by the promotion of Mr. McCoy because of the gender imbalance problem which already existed for AFP's State Director positions, as only 4 out of 36 such positions were held by women at the time of his departure in early 2018.

38. Upon learning that she had not been chosen for the position, Ms. Gravely requested a call with Mr. Joffrion to discuss the reasoning for the decision.

39. AFP uses a system called Market-Based Management ("MBM") principles to evaluate positive management skills.

40. Mr. Bryson had previously iterated that Ms. Gravely effectively utilized MBM principles in

5

her job performance.

41. AFP also utilizes a performance review system called "Situation-Behavior-Outcome" ("SBO"), which provides written documentation of specific feedback with examples from a supervisor to their direct reports.

42. During the call on March 14, 2019, Mr. Joffrion told her that her humility was a concern, that there were concerns with her leadership, and that she poorly applied MBM principles.

43. When Ms. Gravely expressed that she had never heard this feedback from him or anyone else in the entirety of her employment with AFP or its related organizations, she asked if there were any SBOs or other documentation with examples to demonstrate this criticism so she could better understand it.

44. Mr. Joffrion either could not or would not produce any SBOs or other feedback but told her that he would get back to her.

45. In response to Ms. Gravely's questioning about her pathway forward, Mr. Joffrion iterated that she was in the right role, and that while she was not ready for a State Director position, she could grow into the role.

46. Mr. Joffrion also told Ms. Gravely something to the effect of it being clear that her knowledge, skills, and understanding of strategy were very impressive and that she was an integral part of what the chapter looked like.

47. Upon the completion of the phone call, Ms. Gravely called Ms. Oelke to share with her the feedback from Mr. Joffrion.

48. Ms. Oelke informed Ms. Gravely that during a prior phone call between herself and Mr. Joffrion that occurred after the interviews for the State Director position, Mr. Joffrion had expressed to her that Ms. Gravely was far more prepared for the interview and role, but Mr.

6

Case 5:20-cv-00197-D   Document 1-1   Filed 05/12/20   Page 7 of 14

McCoy was a better long-term bet.

49. When Ms. Oelke asked Mr. Joffrion what he meant by that, he was unable to provide an answer.

50. During the same phone call between Mr. Joffrion and Ms. Oelke, in reference to a lawsuit against the network on gender discrimination and sexual harassment, Mr. Joffrion asked Ms. Oelke something to the effect of "if [he] did not give Ms. Gravely the job, would it fall within the class action lawsuit [Ms. Oelke] was leading."

51. Ms. Oelke responded that since Mr. Joffrion had just told that Ms. Gravely was more qualified, it would be categorized as gender discrimination if the job was given to a less qualified man.

52. On or about March 18, 2019, Ms. Gravely contacted Andrea Pittaluga, a Human Resources business partner for GO.

53. Ms. Gravely told Ms. Pittaluga of the feedback she had received from Ms. Oelke, and again expressed her belief that the denial of promotion was gender discrimination because Mr. McCoy was her direct report and had no track record of growth in decision rights and increased responsibility that would justify making a Senior Field Director a State Director.

54. Ms. Pittaluga suggested that she speak with Andrea McCarthy at AFP Human Resources and explain her concerns.

55. On or about March 19, 2018, Ms. Gravely complained to Ms. McCarthy and reiterated the substance of her earlier complaints to Ms. Oelke and Ms. Pittaluga, particularly the lack of SBOs or incidents that would explain why she was not given the State Director position as well as her belief that it constituted gender discrimination.

56. In a subsequent phone call in the days following March 19, 2018, Ms. Gravely also expressed

7

Case 5:20-cv-00197-D   Document 1-1   Filed 05/12/20   Page 8 of 14

to Ms. McCarthy the content of Ms. Oelke's conversation with Mr. Joffrion, in which he admitted she was more qualified and could do the job, but that he was giving the job to a less qualified man.

57. On or about March 22, 2018, Mr. Joffrion called Ms. Gravely to provide the SBOs he had failed to give her in their earlier discussion.

58. The alleged observations of Ms. Gravely's prior performance that were iterated by Mr. Joffrion were mischaracterizations or attributed blame to Ms. Gravely for situations in which Mr. Joffrion's counsel was repeatedly sought but he declined to assist.

59. Mr. Bryson's characterizations of Ms. Gravely's performance as his direct report were based on her work during the same time period that Mr. Joffrion's characterizations arose out of, but they are in opposition to one another.

60. On or about June 25, 2018, Ms. Gravely traveled to Arlington, Virginia, to attend a prearranged meeting with Sarah Field, AFP's Vice President of Judicial Strategy, to discuss AFP's strategy for the North Carolina Supreme Court race.

61. Ms. Field could not attend the meeting and did not provide notice, instead sending a lower-level employee, Savannah Griesinger, to inform Ms. Gravely that decisions were being made about the race without any input from North Carolina representatives.

62. Ms. Griesinger also informed Ms. Gravely that AFP had made a decision regarding engaging in a constitutional amendment ballot initiative, to which Ms. Gravely directly asked Ms. Griesinger something to the effect of "I'd like clarity to understand why this decision was made."

63. Ms. Griesinger put Ms. Gravely in touch with Ms. Field and another senior officer of AFP.

64. The three engaged in a productive meeting where AFP's strategy for North Carolina was

8

thoughtfully discussed and which ended with AFP leadership agreeing to heed Ms. Gravely's advice regarding whether to engage in the North Carolina constitutional amendment issue.

65. Ms. Gravely candidly discussed the issue with Mr. McCoy and expressed her frustration with how the events unfolded, but Mr. McCoy did not appear overly concerned.

66. On July 2, 2018, Ms. Gravely met with Mr. McCoy and Lindsey Morrison from Human Resources.

67. At this meeting, Mr. McCoy alleged that he had had extensive conversations with Mr. Joffrion about Ms. Gravely and repeated Mr. Joffrion's criticism of Ms. Gravely's "recurring issues with humility."

68. Mr. McCoy also told Ms. Gravely that her behavior had caused strained relations with other groups within AFP and with AFP-NC's team members, though any alleged facts he iterated were based on previously undisclosed accusations, recasting of prior incidents that Ms. Gravely had candidly communicated with AFP, and a characterization of Ms. Gravely's behavior toward Ms. Griesinger at their June 15 meeting in Arlington as "rude."

69. Mr. McCoy stripped Ms. Gravely of her roles as coalitions manager and chapter spokesperson, prohibited her from any direct lobbying, and denied her any spending authority on behalf of the organization.

70. Though stunned by the abrupt restriction of her responsibilities, Ms. Gravely moved forward with her work at AFP and received no additional feedback or criticism.

71. From July 16 through July 23, 2018, Ms. Gravely was out of the country on previously scheduled and approved time off.

72. On or about July 24, 2018, Ms. Gravely was sent a calendar invite for a brief, in-person meeting with Mr. McCoy, and also received an email from Mr. McCoy welcoming her back

to the United States.

73. In the meeting on July 26, 2018, Mr. McCoy alleged that Ms. Gravely's lack of regard for collaborating had led to a decrease in her performance, though he did not provide any information regarding what specifically in Ms. Gravely's performance had deteriorated.

74. At the end of this meeting, Ms. Gravely was terminated by Mr. McCoy.

75. According to Mr. Bryson, AFP utilized a process called Performance Improvement Plan ("PIP") for communicating when significant repeated performance deficiencies were recognized by a supervisor.

76. A supervisor would issue an unambiguous PIP to their subordinate, setting out benchmarks of employment that the subordinate must meet over a specified period of time. If the benchmarks were not met, the employments would be terminated.

77. Ms. Gravely never received a PIP.

78. Based on her termination, on or about August 30, 2018 Ms. Gravely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination on the basis of her sex and retaliation against her complaints of discrimination.

79. On or about August 13, 2019, the EEOC invited the parties to participate in conciliation discussions; the Defendant did not want to participate.

80. On January 7, 2020, the EEOC "found reasonable cause to believe that violations of the statue(s) occurred with respect to some or all of the matters alleged in the charge" and sent Ms. Gravely a Notice of Right to Sue ("NRTS"), enabling her to bring the present action.

81. As a result of the discrimination to which Ms. Gravely was subjected, and as a result of her retaliatory termination, Ms. Gravely has suffered and continues to suffer severe emotional distress and significant economic damages.

## FIRST CLAIM FOR RELIEF
### Gender Discrimination

82. Plaintiff hereby incorporates the foregoing paragraphs as if fully set out herein.

83. Defendant's actions, including the denial of Plaintiff's promotion as well as her termination, constitute discrimination against Plaintiff on the basis of her gender.

84. The foregoing discrimination based on Plaintiff's gender is attributable to and was caused by the acts and omissions of the Defendant.

85. Defendant intended to, and did, engage in discriminatory practices against the Plaintiff on the basis of her gender, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*

86. As a result of these actions, Plaintiff has been damaged in an amount to be determined at trial.

87. Plaintiff is entitled to all of her benefits of employment, including, but not limited to back pay, front pay, health insurance, life insurance, retirement benefits, and other benefits.

88. Plaintiff is entitled to recover compensatory damages as provided by the Civil Rights Act of 1991.

89. Plaintiff is entitled to recover reasonable attorney's fees, the costs and expenses of this action, and such further interest as may be allowed by law.

## SECOND CLAIM FOR RELIEF
### Retaliation

90. Plaintiff hereby incorporates the foregoing paragraphs as if fully set out herein.

91. Plaintiff engaged in protected activity by complaining to Defendant about gender discrimination.

92. Plaintiff's employment was terminated within several days after making her complaints to Defendant.

93. The adverse employment action taken by Defendant was because of, and in response to, Plaintiff's protected activity.

94. The actions of Defendant as set forth herein constitute retaliation against Plaintiff for the assertion of her right to be free from sex discrimination. Such retaliation is in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e-3(a).

95. Defendant engaged in retaliation against Plaintiff with either malice or with reckless indifference to the federally protected rights of Plaintiff to be free from sex discrimination in the workplace, as set forth in 42 U.S.C. § 1981a(b)(1).

96. As a result of these actions, Plaintiff has been damaged in an amount to be determined at trial, plus punitive damages, in an amount to be determined by the finder of fact, as well as attorneys' fees.

### THIRD CLAIM FOR RELIEF
### Wrongful Discharge in Violation of North Carolina Public Policy

97. Plaintiff hereby incorporates the foregoing paragraphs as if fully set out herein.

98. Plaintiff was an employee of Defendant.

99. It is the public policy of the State of North Carolina, as stated in N.C. Gen. Stat. § 143-422.2, that employees shall be free from sex discrimination in their employment.

100. Defendant terminated Plaintiff's employment because of her sex.

101. Plaintiff was discriminatorily treated and discriminatorily discharged because of her gender.

102. Said wrongful discharge was in violation of North Carolina public policy.

103. As a result of these actions, Plaintiff has been damaged in an amount to be determined at

trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays the Court for judgment as follows:

a. That all matters so triable be tried before a jury;

b. That Defendant shall compensate Plaintiff for her compensatory damages in an amount to be determined by the finder of fact;

c. For punitive damages in an amount calculated to punish Defendant and deter similar future conduct;

d. For a judgment finding Defendant's employment practices described herein to be unlawful;

e. Pre-judgment and post-judgment interest as provided by law;

f. The costs of this action;

g. Plaintiff's attorneys' fees; and,

h. Such other and further relief as the Court may deem just and proper.

This, the 31st day of March, 2020.

**Kornbluth Ginsberg Law Group, P.A.**
*Attorneys for Plaintiff*

_____
Michael A. Kornbluth
N.C. Bar No. 27928
Email: mkornbluth@kglawnc.com
Joseph E. Hjelt
N.C. Bar No. 53497
Email: jhjelt@kglawnc.com
3400 Croasdaile Drive
Suite 300
Durham, North Carolina 27705
Telephone: (919) 401-4100
Facsimile: (919) 401-4104

13